```
                    IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
```

NIKITA BAILEY, as administrator )
for the Estate of MICHAEL DUNBAR, )
)
        Plaintiff, )   07 C 204
)
    v. )
) JUDGE CONLON
CITY OF CHICAGO, MICHAEL ALESIA, )
MELISSA ULDRYCH, and OTHER AS-YET )
UNIDENTIFIED CHICAGO POLICE OFFICERS, )
)
        Defendants. )   JURY TRIAL DEMANDED

## **AMENDED COMPLAINT**

NOW COMES Plaintiff, NIKITA BAILEY, as the Administrator for the Estate of Michael Dunbar, deceased, through her counsel, LOEVY & LOEVY, complaining of Defendants CITY OF CHICAGO and Chicago Police officers MICHAEL ALESIA (Star No. 18480), MELISSA ULDRYCH (Star No. 6501), and other as-yet unidentified Chicago Police officers (collectively "Defendant Officers") as follows:

### Introduction

1. Plaintiff Michael Dunbar was shot and killed by Chicago Police officer Michael Alesia without lawful justification. Mr. Dunbar was unarmed at the time, and presented no threat to anyone.

2. Mr. Dunbar's death was the direct result of a policy and practice on the part of the City of Chicago. Specifically, the Chicago Police Department has so thoroughly abandoned its responsibility to investigate police shootings that it is basically encouraging its officers to believe that there

will never be any genuine scrutiny or consequences no matter how egregiously unjustified a shooting might be. The net result is that the police officers in the City of Chicago shoot far more citizens than those in other comparable municipalities.

3. Mr. Dunbar died because of this policy and practice. As such, the City is responsible for his death.

### Jurisdiction and Venue

4. This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

5. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. § 1391(b). The parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

### Plaintiff's Death

6. On or about May 3, 2006, at about 10:00 p.m., Mr. Dunbar and a female passenger were sitting in an automobile in the driveway of a parking lot in the vicinity of the 3900 block of West Roosevelt Road.

7. Despite the lack of any reasonable basis to believe that Mr. Dunbar and his passenger had done anything illegal or improper, Defendant Officers approached the car.

8. When the police approached, Mr. Dunbar attempted to drive away. Thereafter, at least one of Defendant Officers fired his weapon at the moving car as it departed. The bullet struck Mr. Dunbar, and, after extreme suffering on his part, killed him.

2

9. This shooting was totally unjustified. Neither Mr. Dunbar nor anyone else did anything which could have justified the use of deadly force.

10. The Officer who shot Mr. Dunbar, as well as the Officer who failed to intervene, were acting under color of law and within the scope of their employment at the time.

### Aftermath

11. After the shooting, police officers unlawfully detained Mr. Dunbar's passenger for the remainder of the night in the police station, whereupon she was repeatedly and relentlessly pressured to provide an account of the shooting which could have justified the officers' actions.

12. Within 48-hours, the City of Chicago had performed a purported "investigation" of this shooting. Spokespersons for the City then issued a press release announcing that the shooting was supposedly "justified," and disseminated to the media a prior and unrelated conviction of Mr. Dunbar.

### The City's Responsibility

13. The City of Chicago maintains a *de facto* policy, practice and custom of failing to properly train, supervise, discipline and control its officers, which was the moving force behind the unjustified shooting of Michael Dunbar.

14. Municipal policy-makers have long been aware of the City's policy and practice of failing to properly train, monitor and discipline its police officers:

a. In 1999, following two high profile police shootings, the City Council held public hearings on the prevalence of police brutality and unjustified shootings, as well as the failure of the Department's disciplinary system. At those hearings, members of the Council assured the public that changes would be made to the Chicago Police Department policies and practices to address these issues.

b. On September 28, 1999, the then-Superintendent of Police gave a speech highlighting problems with the City of Chicago's policies and practices relating to the use of force. Then-Superintendent Hillard spoke specifically of the need for (1) better in-service training on the use of force; (2) early detection of potential problem officers; (3) an effective disciplinary system, and (4) officer accountability for the use of force.

c. In a review commissioned by the Superintendent, John Marshall Law School found that although the City of Chicago's written policy on the use of force was in compliance with the law, more training of police officers was necessary for the written policy to be effective in practice.

d. A few months later, in January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

e. A study performed a year later by the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed that resolution. Specifically, the JCGC study concluded that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct and brutality. The JCGC findings were presented to Mayor Daley, Superintendent Hillard and the Chicago Police Board.

f. Two years later, a federal jury in the case of <u>Garcia v. City of Chicago</u>, No. 01 C 8945, 2003 WL 22175618, *2 (N.D. Ill. Sept. 19, 2003) affirmed that the City's police misconduct investigations were systematically "incomplete, inconsistent, delayed, and slanted in favor of the officers" and as a result, fostered a culture of impunity within the Chicago Police Department. The "City of Chicago's custom and practice of not adequately investigating, disciplining, or prosecuting off-duty Chicago police officers who use excessive force against individuals" was found to have directly caused the constitutional harm. <u>Id.</u> at *1.

g. By its own accounting, in 2004 the City of Chicago sustained only four percent of the thousands complaints brought against police officers for use of excessive force. A far smaller percentage of officers were actually disciplined for their misconduct.

15. Although the City of Chicago has long been aware that its supervision, training and discipline of police officers is entirely inadequate, it has not enacted any measures to

5

address that failure. Redress that was specifically promised by the City Council and the Superintendent has gone unfilled.

16. For example, the City's training program has not changed since 1999, despite repeated promises by the City for a more comprehensive training program. As a result, officers on the streets of Chicago are ill-equipped to make the necessary decisions on the use of force. Further, this lack of training greatly increases of the susceptibility of officers to improper and violent abuses of their police power through the unjustified use of force, such as that at issue in this case.

17. Similarly, the City has failed to institute any system for recognizing problem officers or to ensure an effective disciplinary system.

18. As a result of the City's policies, practices and customs, its officers are emboldened to use unlawful force by their knowledge that they are effectively "above the law" and will not be held accountable for their misconduct.

19. As the City continues to ignore its own role in the abuse by its officers, the number of police shootings in Chicago have actually increased. See Exhibit A, Rupa Shenoy, "Armed and Dangerous," *The Chicago Reporter,* January 2004. In 2003 alone, there were 65 police shootings, 17 of which were fatal, more even than in New York City, which is three times the size of Chicago. Id.

20. At the time that Defendant Officers shot Michael Dunbar, they knew that the City would not subject them to any meaningful investigation, discipline or criminal prosecution.

Their misconduct in this case was a direct result of the City's unconstitutional polices, practices and customs.

### The City's Policies and Practice

21. *Per capita,* police officers in the City of Chicago shoot and kill far more of its residents than officers in comparable cities.

22. In 2003, the last year for which Plaintiff could obtain statistics, Chicago Police Officers shot 65 people and killed 17 of them. New York City Police Officers, by contrast, killed only 13 that year, despite the fact that the population of New York City is about three times larger than that of the City of Chicago.

23. The reason why Chicago Police Officers shoot so many more people than other big City police departments faced with comparable crime rates is because the City of Chicago fails to adequately train, supervise, and discipline its officers in this regard.

24. Consistent with this broken system, when Chicago Police Officers shoot people, the Police Department invariably exonerates the police officer regardless of the actual facts and circumstances of the shooting.

25. This tendency to excuse police shootings regardless of actual fault has become institutionalized and ingrained in the system through several mechanisms.

26. The primary method for whitewashing shooting investigations is the so-called "Roundtable" that is convened immediately after every shooting by a Chicago Police Officer.

7

27. These "Roundtables" are attended by high-ranking police officers. Before any of the key police witnesses are required to go on record in writing, all of the witnesses to the shooting (civilian and police) are brought before the Roundtable to explain what they believe occurred. Unlike the rules in other cities, Chicago Police Officers are first permitted to confer with one another in order to make sure their stories are consistent.

28. Per the custom, notes are taken at the Roundtable on either a dry-erase board or a chalk-board.

29. Prior to their appearance before the Roundtable, witnesses are unlawfully detained in locked rooms in the police department, where they are subjected to coercive interrogations.

30. Witnesses who are willing to provide accounts that justify the shooting are brought before the Roundtable and then released. Witnesses who insist that a shooting was unjustified are detained for hours, often throughout the night, and pressured to provide an account which supports the police version.

31. In 2005, the MacArthur Justice Center brought a class action lawsuit alleging that the Chicago Police Department was detaining witnesses without lawful justification in order to try to develop information. In response to that action, in November 2005, the City of Chicago represented to Chief Judge Holderman of the Northern District of Illinois that it was prohibiting this practice going forward.

32. The City's representation to Judge Holderman was

false. In this case and others, the Chicago Police Officers have continued to detain witnesses to police shootings until they are willing to provide an account favorable to the police.

33. Once the high-ranking police officers at the Roundtable have the full picture of what the witnesses are going to say, but before any police officers are locked in by way of written statements, an official version of the shooting takes shape. Only then does anyone have to go on record.

34. At the conclusion of every Roundtable, the shooting is invariably declared justified. No Roundtable has ever resulted in a finding that a police shooting of another person was anything other than justified.

35. Once the Roundtable determines that the shooting was justified, documentation from the Roundtable is systematically destroyed, including notes and whatever is written on the chalk or dry erase boards. This destruction of the evidence is designed to protect the police shooters.

36. Following every shooting and every Roundtable, the Police Department issues a press release announcing to the community that the particular shooting at issue was justified. These press releases almost always issue within 48-hours of the shooting, and they follow the same cut-and-paste format, to wit, offering a brief explanation that the shooting was justified, withholding the shooters' identities, and disseminating any arrests or criminal history over the course of the entire life of the decedent, including juvenile histories. The local newspapers proceed to print the contents of these press releases.

37. The post-Roundtable justification for the shooting always adheres closely to one of the three formulas: the deceased either (a) pointed a gun at an officer; (b) tried to take an officer's gun; or (c) endangered someone's life.

38. Sometimes – possibly even the majority of the time – one of these three things does indeed occur. However, in a disturbing number of cases, the shootings are in fact unjustified, and are improperly excused after the fact by false contentions, witness manipulation, and/or planted guns.

39. As a matter of custom and practice, after the shooting is declared justified by the Roundtable within 48-hours of the shooting, the City of Chicago's Office of Professional Standards ("O.P.S.") proceeds to bolster that already-existent conclusion with a purported investigation.

40. During that post-conclusion "investigation," the O.P.S. creates documentation which invariably slants toward the officers' version of the shooting in every manner possible. Witness accounts which call the legitimacy of the shooting into question either are not documented, or else are presented in the most unfavorable light possible.

41. With the single exception of high-profile cases with intense media scrutiny (*e.g.*, LaTanya Haggerty and Robert Russ), the O.P.S. never concludes that a police shooting of another person was unjustified. This penchant for justifying police shootings regardless of the actual facts is so prevalent as to constitute the City's policy and practice.

42. The City's enduring tendency to deem every

shooting justified, including those that were not, has at least two consequences, both negative.

43. First, this betrayal of the public's trust destroys the good will of the very community the Police Department is supposed to be serving and protecting. Residents in those communities have no reason to trust/respect the word or authority of a police department that reflexively justifies even the most unjustified shootings, such as this one.

44. More seriously, the direct result of the City's policy and practice is to encourage police officers to be quicker on the trigger than they otherwise might be. This is because even when Chicago Police Officers shoot people without justification, they have every reason in the world to believe that they are guaranteed not to face any genuine investigation, much less discipline. This confidence that they can act with impunity persuades at least some police officers to shoot first and ask questions later, confident in the knowledge that they can falsely justify even egregious shootings after the fact with the assistance of the institutionalized practices of the Department.

45. Mr. Dunbar was a victim of this practice. He was killed because a police officer was arrogant enough to believe that if he used deadly force not only would no one of any authority ever question his poor judgment in any meaningful way, but the Roundtable system and the O.P.S. personnel would swing into motion to create evidence to support the shooting. Sadly, he was correct.

## Count I – 42 U.S.C. § 1983

### Excessive Force

46. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

47. As described in the preceding paragraphs, Defendant Officers subjected Decedent to unreasonable and excessive force.

48. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Decedent's constitutional rights.

49. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

50. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

51. As a matter of both policy and practice, the Chicago Police Department facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading Chicago Police Officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses

such as those affecting Decedent; specifically, Chicago Police Officers accused of excessive force can be confident that the Office of Professional Standards will not investigate those accusations in earnest, and will refuse to recommend discipline even where the Officer has engaged in excessive force.

52. Generally, as a matter of widespread practices prevalent as to comprise municipal policy, officers of the Chicago Police Department abuse citizens in a manner similar to that alleged by Decedent in this Count on a frequent basis, yet the Chicago Police Department makes findings of wrongdoing in a disproportionately small number of cases.

53. Municipal policy-makers are aware of, and condone and facilitate by their inaction, a "code of silence" in the Chicago Police Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case.

54. The City of Chicago has failed to act to remedy the patterns of abuse describe in the preceding sub-paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

55. As a matter of express policy, the City of Chicago does not retain any records which are more than seven years old documenting allegations of excessive force against police officers, thereby preventing the City from ascertaining any patterns of abuse which might develop over the course of a police officer's career. Further, the City fails to utilize even the

records that are retained to identify and respond to patterns of misconduct by its officers.

56. As a matter of express policy, the City of Chicago refuses to take into consideration patterns of allegations of civil rights violations when evaluating the merits of any particular complaint. In other words, if a police officer is accused of the same sort of misconduct twenty times in row, O.P.S. will not consider those allegations if they are deemed unsustained.

57. As a result of the unjustified and excessive use of force, as well as the City of Chicago's policy and practice, Decedent experienced conscious pain and suffering, his Estate has incurred medical and funeral expenses, and Decedent has suffered injury and emotional distress, including loss of society and companionship.

## Count II - 42 U.S.C. §1983

### Failure to Intervene

58. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

59. In the manner described above, during the constitutional violations described above, one or more Defendant Officers stood by without intervening to prevent the misconduct.

60. As a result of this failure to intervene to prevent the violation of Decedent's constitutional rights, Decedent suffered pain and injury, as well as emotional distress. These Officers had a reasonable opportunity to prevent this harm, but failed to do so.

61. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with willful indifference to Decedent's constitutional rights.

62. The misconduct described in this Count was undertaken pursuant to Chicago's policy and practice in the manner described in preceding paragraphs.

### Count III – State Law Claim
### Wrongful Death – Intentional Battery

63. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

64. As described more fully in the preceding paragraphs the actions of the Defendant Officers constituted offensive physical contact made without the consent of the Decedent.

65. These actions were undertaken intentionally, willfully and wantonly, and were the proximate cause of Decedent's great bodily harm and death, as well as Decedent's great pain and suffering.

66. The misconduct described in this Count was undertaken with intentional disregard of the Decedent's rights.

67. As a result, the Estate has incurred medical and funeral expenses, and suffered injury, including loss of society and companionship.

### Count IV – State Law Claim
### Wrongful Death – Reckless Battery

68. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

69. As described more fully in the preceding paragraphs the actions of Defendant Officers constituted offensive physical contact made without the consent of the Decedent.

70. These actions were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

71. These actions proximately caused Decedent great bodily harm and death, as well as great pain and suffering to Decedent.

72. As a result of these actions, the Estate has incurred medical and funeral expenses, and suffered injury, including loss of society and companionship.

**Count V - State Law Claim**

**Survival Action - Intentional Battery**

73. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

74. As described more fully in the preceding paragraphs, the actions of Defendant Officers constituted offensive physical contact made without the consent of the Decedent.

75. These actions were undertaken intentionally, willfully and wantonly.

76. These actions proximately caused Decedent great bodily harm, pain and suffering, and then death.

77. The misconduct described in this Count was undertaken with intentional disregard of the Decedent's rights.

78. As a result of these actions, Decedent experienced conscious pain and suffering.

## Count VI - State Law Claim

### Survival Action - Reckless Battery

79. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

80. As described more fully in the preceding paragraphs, in restraining Decedent, the actions of Defendant Officers constituted offensive physical contact made without the consent of the Decedent.

81. These actions were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

82. These actions proximately caused Decedent great bodily harm, pain and suffering, and then death.

83. The misconduct described in this Count was undertaken reckless disregard of the Decedent's rights.

84 As a result of these actions, Decedent experienced conscious pain and suffering.

## Count VII - State Law Claim

### Respondeat Superior

85. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

86. In committing the acts alleged in the preceding paragraphs, Defendant Officers were each members of, and agents of, the Chicago Police Department acting at all relevant times within the scope of his or her employment.

87. Defendant City of Chicago is liable as principal for all torts committed by its agent.

### Count VIII – State Law Claim
### Indemnification

88. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

89. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

90. Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, NIKITA BAILEY, as Administrator for the Estate of MICHAEL DUNBAR, respectfully requests that the Court enter judgment in her favor and against the Defendants CITY OF CHICAGO, MICHAEL ALESIA, and MELISSA ULDRYCH, awarding compensatory damages (including medical and funeral expenses), punitive damages against Defendants Alesia and Uldrych, and attorneys' fees, as well as any other relief this Court deems just and appropriate under the circumstances.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

S/ Jon Loevy
Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Michael Kanovitz
Amanda Antholt
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

CERTIFICATE OF SERVICE

I, Jon Loevy, an attorney, certify that on March 6, 2007, I served this document by ECF electronic filing as to each party who is represented by counsel who uses electronic filing.

S/Jon Loevy